COMMONWEALTH *vs.* FREDERICK H. DUNKER, JR.

Suffolk.    May 7, 1973. — July 2, 1973.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, KAPLAN,
& WILKINS, JJ.

*Evidence,* Dying declaration.  *Practice, Criminal,* Assistance of coun-
sel, Argument by prosecutor.  *Constitutional Law,* Assistance of
counsel.

Where a severely injured victim twice accused the defendant of
shooting him, once shortly before he expressed a belief that he was
dying and once shortly thereafter, and died four days later, the
accusations were admissible as dying declarations.  [793–795]
Where defence counsel in a murder trial which lasted seven days
presented a vigorous and competent defence, but commented in
his closing argument on the duty of an attorney to defend a client
even if the client had admitted guilt, and where the judge charged
the jury that counsel's arguments are not evidence, the defendant
was not denied his right to the effective assistance of counsel.
[795–798]
At the trial of an indictment for murder, the prosecutor's comments
in his closing argument on an apparent mid-trial switch in de-
fence tactics from self-defence to alibi were proper.  [798–800]

INDICTMENT found and returned in the Superior Court
on September 14, 1970.

The case was tried before *McLaughlin,* C.J.

*Robert V. Greco* for the defendant.

*Thomas E. Finnerty,* Assistant District Attorney
(*Martin R. Rosenthal,* Legal Assistant to the District
Attorney, with him) for the Commonwealth.

WILKINS, J.   The defendant appeals under G. L.
c. 278, §§ 33A–33G, from his conviction of murder in the
second degree on an indictment charging him with mur-
der in the first degree.   The victim was found on a street
in the vicinity of Fields Corner in Dorchester in the early
morning of June 25, 1970.   There were no eyewitnesses
to the shooting.   The victim was taken to the accident
ward at Boston City Hospital where in two separate in-
terviews by police officers he identified the defendant as

Commonwealth *v.* Dunker.

the person who shot him. In addition to the victim's identification of the defendant, the Commonwealth's case rested on alleged admissions of guilt made by the defendant to two inmates at Bridgewater State Hospital to which the defendant was committed for observation in September, 1970.

The defendant has argued three assignments of error. He claims that the statements made by the victim were improperly admitted in evidence as dying declarations. He next contends that the closing argument of his then counsel was so inadequate that it virtually constituted an admission of guilt and that consequently he was denied the assistance of counsel to which he was constitutionally entitled under the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution. Finally, he argues that the assistant district attorney committed reversible error in his closing argument to the jury by making unfair comment about the defence of the case. There was no error.

1. Statements made to police officers by the victim were properly admitted as dying declarations.

The victim was shot about 2:25 A.M. About 3:30 A.M., he was questioned by a police sergeant at the X-ray room on the accident floor of Boston City Hospital. The victim had been shot in the head and was bleeding from the left cheek, mouth and right side of the neck. The victim indicated to the police sergeant that he had been shot by the defendant. The victim wrote on a piece of paper, "Fred Dunker shot me." That paper was admitted in evidence. In the course of this interview there was no discussion of the victim's state of mind concerning death. Half an hour later, about 4 A.M., the victim spoke with his father in the accident ward and said he was dying and wanted to go home. His face was swollen; there was blood on various parts of his head; he had a hole on the right side of his neck and on his left cheek. About 4:30 A.M. the victim spoke to a second police officer in the accident room and said that the defendant shot him. In this interview

there was no discussion of the victim's physical condition or his attitude concerning recovery. The officer testified, however, that in his opinion the victim was in "bad shape." Later in the morning the victim repeated to his father that he was dying. The victim died on June 29.

After a voir dire, the judge found that at the time the statements were made the victim believed he was in immediate danger of death and had no expectation of recovery. The judge allowed the statements to be admitted in evidence. On substantially the same evidence, the question was put to the jury whether the victim's statements were made in circumstances which qualified them as dying declarations.[1]

The defendant's principal argument is that there was insufficient evidence for either the judge initially or the jury ultimately to find that the victim had a fixed sense of impending death at the time he made the statements to the police.

A dying declaration is admissible only if "all hope of recovery has gone from the mind of the declarant, and he speaks under a sense of impending death." *Commonwealth* v. *Polian*, 288 Mass. 494, 497, and cases cited. There was sufficient evidence to permit first the judge and then the jury, on proper instructions, to find that the condition existed which made the victim's statements admissible under this rule. The victim's statement to his father that he was dying and wanted to go home warranted a finding that he had abandoned any hope of being saved by medical care and wished to go home to die.

The judge was justified and the jury would have been justified in finding the victim's first incriminating statements to be dying declarations, even though those statements were made one-half hour before the victim told his father he was dying. See *People* v. *Page*, 28 Cal. App.

---

[1] The victim's statements were not offered, nor would they have been admissible, under G. L. c. 233, § 65, as declarations of a deceased person. That statute applies only in "civil judicial proceedings" and thus does not apply to criminal prosecutions. *Commonwealth* v. *Gallo*, 275 Mass. 320, 335–336. See *Commonwealth* v. *Dawn*, 302 Mass. 255, 261.

2d 642, 646–647; *State* v. *Achziger*, 497 P. 2d 383 (Ore. App.). The person through whom the declaration is offered need not also testify as to the abandonment of hope by the declarant. *Commonwealth* v. *Hoff*, 315 Mass. 551, 554. The declarant's apprehension of impending death may be shown by other evidence (*Commonwealth* v. *Haney*, 127 Mass. 455, 458) and may be inferred from the circumstances, even if he made no explicit statement concerning impending death. See *Commonwealth* v. *Viera*, 329 Mass. 470, 472–473; McCormick, Evidence (2d ed.) § 282; Wigmore, Evidence (3d ed.) § 1442.

The statement written by the victim that "Fred Dunker shot me" was properly admitted. It was his own statement, and did not have to be signed. Jones, Evidence (6th ed.) § 9:6. Anderson, Wharton's Criminal Evidence (12th ed.) § 320. Wigmore, Evidence (3d ed.) § 1445, p. 245.

2. There was no denial to the defendant of the effective assistance of counsel. The defendant limits his criticism of the conduct of his trial counsel to portions of his closing argument. The trial took place over a period of seven trial days during which counsel for the defendant vigorously contested many points. It was a hard fought trial. On occasion each side may have manifested an excess of zeal in support of its cause. Surely when the evidence was all in, there was no rational basis for the jury to believe that the defendant, who testified, and his counsel were not contesting the Commonwealth's case fully and wholeheartedly to the end.

Toward the beginning of his closing argument to the jury defence counsel said the following: "Now, under our law, no man is permitted to go to trial without being represented by counsel. By counsel I mean a lawyer. You know that. And I was appointed by the Court to do this. And I am just as obligated to him as a court appointed lawyer as if he had paid me a tremendous fee. And I must exert every bit of experience, acumen, skill and artistry that I possibly can to prove his innocence. Now I am sure that during the course of your lives you

have put a question to a fellow or somebody else who was trained to legal terms.  Supposing a man comes to you and he says he is guilty of a crime, shall you defend him? And you know, Mr. Foreman and ladies and gentlemen of the jury, that has been on the bar examination so many times it is ridiculous.  Your duty is — if you answer no, you flunk.  You must answer, you must defend him because it is the duty of the Commonwealth to prove that he is guilty beyond a reasonable doubt.  And if you don't do that, you are remiss in your duty and you are not an advocate; neither are you a lawyer.

"So we start with the proposition as his Honor will instruct you, and I am not going to give you any law because that will be given to you by his Honor; that the defendant steps before you innocent."

After several minutes of somewhat disjointed argument, defence counsel focused on the doubtful credibility of two of the prosecution witnesses, convicted felons who might have testified concerning admissions of guilt by the defendant in order to expedite their freedom from prison.  Defence counsel then questioned the reliability of the victim's alleged dying declarations.  Next, defence counsel said: "You even have a situation that went so far as when the defendant was apprehended, that the man who was deceased . . . [the victim] was still alive; still aware of his circumstances; and there could have been a confrontation.  Mr. Foreman, ladies and gentlemen of the jury, if that happened, we wouldn't be here. Couldn't be here.  I take that back.  We could be here because it would still be my duty to defend this man if I was appointed by the Court and defend him to the best of my ability.  And even if there were three choices; plead the man guilty, plead him not guilty and try him, or refuse to take the case; what do you think my duty is? I will tell you what it is.  I must take that case, plead him not guilty and defend him, because it is not my duty to prove that he is not guilty.  And remember that.  That is the most important function of the law that makes this country different from every country in the world today.

My duty is to defend him and call upon the Government to prove him guilty beyond a reasonable doubt. And if I don't, I am not only remiss in my duty, I am absolutely unfit to practice law as a lawyer."

Counsel next argued in support of the evidence presented through the defendant and others that he was in New Bedford, not Boston, on the night of the shooting. He pointed out the absence of any eyewitness to the shooting and concluded with the question whether any one of the jurors would himself be satisfied to be found guilty on the evidence presented in court.

When viewed in the context of the entire trial, the entire final argument, and the trial judge's charge that the arguments of counsel are not evidence, the challenged statements of defence counsel fall far short of descending to that level of ineffectiveness which constitutes an unconstitutional denial of a criminal defendant's right to counsel. See *Commonwealth* v. *Bernier*, 359 Mass. 13, 17–19, where cases dealing with this constitutional question are carefully summarized. Our opinion in the *Bernier* case and more recent Federal opinions show that counsel's errors of judgment do not invalidate a criminal trial on constitutional grounds unless counsel's representation was so ineffective that the defendant was granted no trial in any real sense. *United States* v. *Valenzuela-Mendoza*, 452 F. 2d 773, 774 (9th Cir.). *Calhoun* v. *United States*, 454 F. 2d 702, 703 (7th Cir.). *Allen* v. *Perini*, 458 F. 2d 233, 236 (6th Cir.).

We view the remarks of defence counsel, quoted above, as designed to point out by hypothetical example the heavy burden of proof which the law places on the Commonwealth in a criminal prosecution. The words used were not well chosen. Surely, the purpose of the argument could have been made more clear. When, however, the remarks to which the defendant objects are considered in context, no inference by the jury that defence counsel believed the defendant to be guilty would have been warranted.

The cases relied on by the defendant involve situations

where the action of defence counsel was so deficient as to amount to no representation at all. *United States* v. *Hammonds,* 425 F. 2d 597, 600–604 (D. C. Cir.). *Matthews* v. *United States,* 449 F. 2d 985 (D. C. Cir.). *Johns* v. *Smyth,* 176 F. Supp. 949, 952–953 (E. D. Va.). *People* v. *DeSimone,* 9 Ill. 2d 522, 531. *State* v. *Merchant,* 10 Md. App. 545, 563.

3. The final assignment of error argued to us involves a claim that in his closing argument the prosecutor engaged in improper comment concerning testimony elicited by the defence from the victim's father. The judge ruled that the argument was proper. The prosecutor's comments suggest that in the midst of the trial the defence changed its tactics from self-defence to alibi. The significant portion of the prosecutor's challenged remarks is set forth in the margin.[2]

In order to assess the propriety of the prosecution's closing argument, certain portions of the trial must be analyzed. In the course of the cross-examination of the victim's father, the Commonwealth objected to a question whether the victim was married. Out of the hearing of the jury, defence counsel stated that the evidence was material because "our defense here is going to be self

---

[2] ASSISTANT DISTRICT ATTORNEY: "There was another question that . . . [counsel for the defendant] asked . . . [the victim's father]. And this I think was a very telling, very telling question. 'Would he get upset if someone was seeing his wife.' What does that sound like to you? Does that sound like alibi? Does that sound like alibi or does it sound like self defense?" COUNSEL FOR THE DEFENDANT: "Now I object." THE JUDGE: "That is a perfectly proper comment. You may continue." COUNSEL FOR THE DEFENDANT: "All right." ASSISTANT DISTRICT ATTORNEY: "Well, I hope you remember that because at the time it didn't seem too important. But if that doesn't sound like self defense, I don't know what it does sound like. It certainly doesn't sound like alibi, forty miles away with his mother, sisters and cousins. Doesn't sound like alibi at all. 'Was your son easily excitable? Was he hot headed? Did you have trouble with him? Did he have trouble with the law? Was he aggressive?' All those things, alibi? 'Would he get upset if somebody was seeing his wife?' Do you get the pitch? Do you get the pitch? Somebody must have changed their minds at some point." COUNSEL FOR THE DEFENDANT: "No, I object to that." THE JUDGE: "No, that may stand." COUNSEL FOR THE DEFENDANT: "May I have an exception to that argument." THE JUDGE: "You may have an exception."

defense." [3]    Based on that representation, the judge allowed the question and admitted other evidence concerning the victim.    On questioning by the defence, the victim's father testified that, except on occasion, the victim had not been living with his wife for four years prior to his death; he could not be the judge of whether the victim disliked his wife; he had trouble with his son; and his son was quick tempered.    When the witness testified that he did not know whether his son "would take offense . . . at anybody who was stepping out or having any affair with his wife," the judge asked counsel in front of the jury whether he was "going to have evidence of that."    Counsel replied, "Yes, I am, definitely."    No such evidence was ever introduced.

Later in the trial, toward the end of the prosecution's case and on the morning of the day the defence put on its first alibi witnesses, the defence asked one of the police officers who had talked to the victim at the hospital whether the victim told him that he had an argument with the defendant.    The officer answered in the affirmative.    Thus, virtually to the close of the prosecution's case the defendant was apparently undertaking to establishe some justification for the killing, at least enough to show that he was not guilty of murder in the first degree.

We agree with the judge that there was no error in the prosecutor's reference to the apparent switch in defence tactics.    This is not an instance in which the prosecutor seemingly revealed damaging information not known to the jury.    *DeChristoforo* v. *Donnelly,* 473 F. 2d 1236 (1st Cir.), rev'd sub nom.    *Donnelly* v. *DeChristoforo,* 416 U. S. 637.    His remarks were concerned with questions put by defence counsel and answers given before

---

[3] Counsel for the defendant continued saying, "I am saying this is what I intend to prove.    The deceased alleged that this defendant had an affair with his wife.    I want to prove that they weren't living together and then they were living together and he accused them of it and this led to the altercation that resulted in the shooting."    THE JUDGE: "You are going to produce evidence of that?"    COUNSEL FOR THE DEFENDANT: "That's right."

the jury.   If he speaks with propriety on matters on the record before the jury, a prosecutor may properly comment on the trial tactics of the defence and on evidence developed or promised by the defence.   See *Commonwealth* v. *French*, 357 Mass. 356, 393–394; *Commonwealth* v. *DeCaro*, 359 Mass. 388, 391–392.   Indeed the evidence introduced by defence counsel concerning the character of the victim and the occurrence of an argument between the victim and the defendant may have been the evidence which prompted the jury to find the defendant guilty of second, and not first, degree murder.

On our review of the whole case, we find no occasion to order a new trial or to grant any other relief to the defendant.   G. L. c. 278, § 33E.

*Judgment affirmed.*